UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GRANT NAPEAR,<br><br>                    Plaintiff,<br><br>        v.<br><br>BONNEVILLE INTERNATIONAL<br>CORPORATION,<br><br>                    Defendant. | No.  2:21-cv-01956-DAD-DB<br><br><br>ORDER DENYING PLAINTIFF'S MOTION<br>TO MODIFY THE SCHEDULING ORDER<br>AND GRANTING IN PART AND DENYING<br>IN PART DEFENDANT'S MOTION TO<br>DISMISS<br><br>(Doc. Nos. 52, 56) |

This matter came before the court on July 18, 2023 for a hearing on plaintiff's motion to modify the governing scheduling order and for leave to file a third amended complaint and defendant's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Doc. Nos. 52, 56.)  Attorney Matthew Ruggles appeared by video for plaintiff.  Attorneys Tanner Camp and David Jordan appeared by video on behalf of defendant.  For the reasons explained below, plaintiff's motion to modify the scheduling order and for leave to file a third amended complaint will be denied and defendant's motion to dismiss plaintiff's second amended complaint will be granted in part and denied in part.

/////

/////

1

1

**BACKGROUND**

2

**A.      Factual Background**

3          On May 11, 2023, plaintiff filed the operative second amended complaint ("SAC") in this

4    employment discrimination and retaliation action against defendant, his former employer.  (Doc.

5    No. 49.)  This court previously dismissed plaintiff's first amended complaint in its entirety due to

6    plaintiff's failure to state a cognizable claim but granted plaintiff leave to file the SAC in an order

7    issued on April 20, 2023.  (Doc. No. 48.)  In the SAC, plaintiff alleges as follows.

8          Plaintiff was an on-air talk show host for a popular sports radio talk show in the

9    Sacramento region for approximately 25 years.  (Doc. No. 49 at ¶¶ 11–14.)  For most of those

10   years, plaintiff's employer was KHTK 1140AM until defendant purchased KHTK 1140AM in

11   2018.  (*Id.* at ¶¶ 14, 16.)  In 2019, defendant renewed plaintiff's employment contract for the 26th

12   consecutive year as the host of the Grant Napear Show With Doug Christie for a one-year term

13   from August 1, 2019 through July 31, 2020.  (*Id.* at ¶ 17.)

14         On the evening of May 31, 2020, plaintiff was at his home watching regional and national

15   news broadcasts that were televising events involving protests over the death of George Floyd in

16   Minnesota.  (*Id.* at ¶ 30.)  At approximately 8:30 p.m., DeMarcus Cousins, a former Sacramento

17   Kings player, posted a tweet on his Twitter account that was directed at plaintiff and asked him:

18   "What's your take on BLM [Black Lives Matter]?"  (*Id.* at ¶¶ 31.)  Plaintiff responded to Mr.

19   Cousins' tweet with a tweet of his own:  "Hey!!!  How are you?  Thought you forgot about me.

20   Haven't heard from you in years.  ALL LIVES MATTER…EVERY SINGLE ONE."  (*Id.* at ¶

21   32.)

22         The following day, on June 1, 2020, defendant's representative, Steve Cottingim,

23   informed plaintiff that he was suspended from his radio show.  (*Id.* at ¶ 33.)  The day after that,

24   on June 2, 2020, defendant informed plaintiff that he was being terminated for cause as defined in

25   his employment contract.  (*Id.* at ¶¶ 35–36.)  Specifically, defendant maintained that plaintiff was

26   terminated pursuant to paragraph 6(c)(vii), which states that "the term 'Cause' shall be defined as

27   any of the following conduct by Employee, as determined by the Company in its reasonable

28   discretion: . . . Any act of material dishonesty, misconduct, or other conduct that might discredit

2

1   the goodwill, good name, or reputation of the Company."  (*Id.*)

2          Plaintiff alleges that defendant's reason for terminating him was a "false and pretextual

3   reason[]" for his termination and that he was actually terminated for expressing his sincere

4   religious beliefs and political views.  (*Id.* at ¶¶ 54, 63–64.)  According to the SAC, plaintiff "has

5   been a Christian and a practicing member of the Unitarian Universalist Church . . . his entire life."

6   (*Id.* at ¶ 6.)  In dismissing plaintiff's first amended complaint, the court had found that plaintiff

7   had failed to allege sufficient facts indicating that defendant was even aware of his religious

8   beliefs, let alone that it had discriminated against plaintiff on the basis of those beliefs.  (Doc. No.

9   48 at 10–11.)  Plaintiff now alleges in the SAC that he "periodically spoke with his co-workers . .

10  . about his religion and his faith in God," "was open about his religious beliefs and discussed the

11  topic at work," and "often attended religious services on Sundays, and discussed this fact with his

12  co-workers."  (Doc. No. 49 at ¶ 29.)  Plaintiff also alleges that he "can specifically recall

13  discussing his religion with his former co-host, Mike Lamb, as well as Doug Christie, and []

14  believes that he discussed the subject with other co-workers that he cannot specifically recall."

15  (*Id.*)

16          In addition, the court previously concluded that plaintiff had not alleged facts suggesting

17  that the May 31, 2020 tweet was self-evidently religious in nature, or that he was replaced by

18  someone of a different religious creed, or any other facts giving rise to an inference that defendant

19  terminated plaintiff based on his religious beliefs.  (Doc. No. 48 at 11.)  In the SAC, plaintiff now

20  alleges his tweet was a "personal expression" of his "sincerely held Christian religious beliefs,"

21  that his tweet was "a self-evident expression" of those beliefs, and that "[m]any people . . .

22  including . . . [plaintiff's] co-workers" and "members of the public" understood the tweet to be an

23  expression of plaintiff's "Christian religious beliefs."  (Doc. No. 49 at ¶¶ 55–56.)  Plaintiff further

24  alleges that the religious nature of his tweet was "evidenced by numerous written comments,

25  emails and letters received by" defendant that showed "members of the public recognized the

26  religious nature and religious principles reflected by [plaintiff's] . . . public expression of the

27  phrase 'ALL LIVES MATTER…EVERY SINGLE ONE.'"  (*Id.* at ¶ 56.)  Plaintiff "is [also]

28  informed and believes and on that basis alleges" that the person defendant hired to replace

1  plaintiff "was not a member of the Unitarian Universalist Church."  (*Id.* at ¶ 57.)

2  At the same time plaintiff alleges that the May 31, 2020 tweet was a personal expression

3  of his sincerely held religious beliefs, he also alleges that it was a "public political message" that

4  "was a personal expression of [plaintiff's] . . . political opinion and ideology that all persons are

5  created and remain equal under the law regardless of race, gender, religion, national origin,

6  political affiliation, or any other basis."  (*Id.* at ¶ 63.)  By posting his May 31, 2020 tweet,

7  plaintiff "was expressing that political message and ideology and encouraging other members of

8  society to adopt and follow a more inclusive political belief and point of view compared to the

9  less inclusive political message of the Black Lives Matter political movement."  (*Id.*)  According

10  to plaintiff, defendant interpreted his "public political message" as "anti-[Black Lives Matter]"

11  and thus "politically *incorrect*" because in its public statement regarding plaintiff's termination,

12  defendant called plaintiff's tweet "particularly insensitive" and stated that it did "not reflect the

13  views or values of" defendant.  (*Id.* at ¶¶ 38, 64–65.)  In fact, plaintiff's direct supervisor, Mr.

14  Cottingim, testified at his deposition that the phrase "ALL LIVES MATTER" was inappropriate

15  when stated in direct response to the question "Do you support Black Lives Matter," which

16  plaintiff alleges is exactly the type of "public political exchange" that occurred on May 31, 2020

17  between Mr. Cousins and plaintiff on Twitter.  (*Id.* at ¶ 65.)  Defendant also "disapproved of" the

18  political message contained in plaintiff's tweet because it was "inconsistent with the political

19  message and slogan that 'Black Lives Matter'" and "would result in political protestors in

20  Sacramento focusing on [defendant] . . . including but not limited to potential property damage to

21  KHTK 1140AM's office building and broadcasting studio. . . ."  (*Id.* at ¶ 66.)

22  Due to the "political and/or religious nature of Plaintiff's six-word public message"

23  plaintiff alleges that key individuals involved with his termination objected to the tweet and

24  "expressed negative emotion" regarding plaintiff.  (*Id.* at ¶ 67.)  Defendant used plaintiff's

25  termination "as an example to all other employees of the Company as an implicit warning that

26  anyone that dared to speak out publicly and criticize the politics of the Black Lives Matter

27  movement would be summarily terminated."  (*Id.* at ¶ 69.)  In response to his termination,

28  plaintiff alleges that several employees made internal complaints to defendant regarding their

concern that defendant, through plaintiff's termination, was sending this exact message to its employees.  (*Id.*)

Based on these allegations, plaintiff asserts three claims in his SAC:  (1) wrongful termination in violation of public policy; (2) discrimination on the basis of religion in violation of the California Fair Employment and Housing Act, California Government Code § 12940, *et seq.* ("FEHA"); and (3) retaliation in violation of California Labor Code §§ 1101 and 1102.  (Doc. No. 49 at ¶¶ 46–73.)

**B.      Procedural Background**

On August 25, 2022, this case was reassigned to the undersigned.  (Doc. No. 35.)  At the time of reassignment, defendant's December 23, 2021 motion to dismiss plaintiff's first amended complaint had been pending for nine months.  (*See* Doc. Nos. 13, 48.)

On October 7, 2022, the undersigned issued a pretrial scheduling order after considering a joint status report filed by the parties.  (Doc. Nos. 40, 41.)  In that joint status report, plaintiff stated that, "[a]lthough Plaintiff contends that Defendant's motion to dismiss is unwarranted, Plaintiff requests an opportunity to further amend the First Amended Complaint if any portion of the motion is granted."  (Doc. No. 40 at 3.)  Consequently, the court's scheduling order stated: "Plaintiff anticipates amending his pleadings further if the court grants defendant's pending motion to dismiss his first amended complaint, with leave to amend.  No further joinder of parties or amendments to pleadings is permitted without leave of court, good cause having been shown."  (Doc. No. 41 at 2.)  The parties were given an opportunity to object to the October 7, 2022 scheduling order, and neither did so.  (*Id.* at 6–7.)

On January 3, 2023, the court issued a minute order advising the parties of its overwhelming backlog of submitted motions and encouraged the parties to file their completed Consent / Decline of U.S. Magistrate Judge Jurisdiction forms.  (Doc. No. 43.)

On April 20, 2023, this court issued its order granting defendant's motion to dismiss plaintiff's first amended complaint in its entirety with leave to amend.  (Doc. No. 48.)  On May 11, 2023, plaintiff filed his SAC.  (Doc. No. 49.)  Eleven days later, on May 22, 2023, plaintiff filed a motion to modify the court's scheduling order and for leave to file a third amended

complaint to add a new claim for breach of contract.  (Doc. No. 52.)  On June 5, 2023, defendant filed an opposition to the pending motion to modify the scheduling order.  (Doc. No. 58.) Plaintiff filed his reply thereto on June 12, 2023.  (Doc. No. 60.)  Meanwhile, on June 1, 2023, defendant filed the pending motion to dismiss plaintiff's SAC in its entirety.  (Doc. No. 56.)  On June 15, 2023, plaintiff filed an opposition to defendant's motion to dismiss (Doc. No. 61), and defendant filed its reply thereto on June 26, 2023 (Doc. No. 62).

**ANALYSIS**

**A.      Plaintiff's Motion to Modify the Scheduling Order and for Leave to File a Third Amended Complaint**

Although plaintiff is seeking to amend the SAC, this court's scheduling order provides that there will be no further amendment of the pleadings.  (Doc. No. 41 at 2.)  Thus, as an initial matter, plaintiff must establish that there is "good cause" under Federal Rule of Civil Procedure 16 to modify the court's scheduling order to permit amendments to pleadings.

1.      Legal Standard

Once the district court has issued a pretrial scheduling order pursuant to Rule 16 establishing the time for any amendment to the pleadings, "a motion seeking to amend pleadings is governed first by Rule 16(b), and only secondarily by Rule 15(a)." *Jackson v. Laureate, Inc.*, 186 F.R.D. 605, 607 (E.D. Cal. 1999) (citing *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 607–08 (9th Cir. 1992)).  Under Rule 16, the court will only modify a scheduling order upon a showing of "good cause" by the moving party.  Fed. R. Civ. P. 16(b)(4); *Johnson*, 975 F.2d at 609.  "Unlike Rule 15(a)'s liberal amendment policy, which focuses on the bad faith of the party seeking to interpose an amendment and the prejudice to the opposing party, Rule 16(b)'s 'good cause' standard primarily considers the diligence of the party seeking the amendment." *Johnson*, 975 F.2d at 609.  "Although the existence or degree of prejudice to the party opposing the modification might supply additional reasons to deny a motion, the focus of the inquiry is upon the moving party's reasons for seeking modification." *Id.*  "If that party was not diligent, the inquiry should end." *Id.*

/////

1       Here, the court's October 7, 2022 scheduling order provided that no further amendments

2   to the pleadings would be permitted.  Thus, the principal issue before the court is simply whether

3   plaintiff was diligent in "seeking the amendment" to his pleadings.  *Johnson*, 975 F.2d at 609.

4         2.      Whether Plaintiff Was Diligent in Seeking to Amend His Pleadings

5       For the reasons explained below, the court concludes that plaintiff was not diligent in

6   seeking to assert his breach of contract claim because plaintiff:  (i) could have raised the breach of

7   contract claim since this case's inception; and (ii) was aware in March 2022 of the purportedly

8   new evidence that he argues strengthened his potential breach of contract claim, but nonetheless

9   he did not move to add that claim until May 2023.

10       First, a party seeking to modify a scheduling order typically fails to show "good cause"

11   where the party "has been aware of the facts and theories supporting amendment since the

12   inception of the action."  *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 737

13   (9th Cir. 2013) (affirming a district court's denial of a request to modify scheduling order to add

14   new claims).  Since this case's inception, plaintiff has been aware of his employment contract, the

15   contract's specific for cause provision that defendant relied on in terminating plaintiff, and that

16   defendant contended that plaintiff's May 31, 2020 tweet constituted "misconduct" under that

17   contract provision.  In fact, plaintiff alleged in his prior iterations of his complaint that:  (i)

18   defendant terminated him under the relevant for cause provision of his contract; (ii) his conduct

19   (i.e., the May 31, 2020 tweet) was not an act of "misconduct" or "material dishonesty," and "was

20   not a violation of any contract term of provision"; and (iii) he suffered damages as a result of

21   defendant's decision to terminate him.  (Doc. Nos. 1 at ¶¶ 37, 47, 48, 50 (complaint); 12 at ¶¶ 37,

22   57, 58, 60 (first amended complaint).)  Thus, these previous allegations advanced by plaintiff—

23   which remain in the SAC—indicate that plaintiff was clearly aware of sufficient facts upon which

24   to assert a breach of contract claim from the outset of this case.  *See AmerisourceBergen Corp. v.*

25   *Dialysist W., Inc.*, 465 F.3d 946, 953 (9th Cir. 2006) ("[I]n evaluating undue delay, we also

26   inquire 'whether the moving party knew or should have known the facts and theories raised by

27   the amendment in the original pleading.'") (citation omitted).

28   /////

1   At the hearing on the pending motions, and in his brief, plaintiff conceded that he

2   considered asserting a breach of contract claim at the outset of the case but decided "as a matter

3   of strategy" that it would be too difficult of a claim to prove.  (Doc. No. 52-1 at 10–11.)  Plaintiff

4   now argues that his strategy changed when he received a copy of a July 2020 "Bonneville Beat"

5   newsletter in March 2022, which stated in part:  "We will respect individuals' choices about

6   which organizations they choose to support personally."  (*Id.* at 11.)  Based on this language,

7   plaintiff contends that defendant had a policy that "appears to apply to (and permit) Plaintiff's

8   alleged 'misconduct'" thereby making his breach of contract claim viable.  (*Id.*)  The court finds

9   that this line of argument is unpersuasive under the circumstances presented here.

10   Generally, a mere change in litigation strategy is insufficient to constitute good cause.  *See*

11   *Martinez v. Petrenko*, 792 F.3d 173, 180 (1st Cir. 2015) ("'Good cause' does not typically include

12   a change of heart on a litigation strategy.").  Moreover, even if the July 2020 newsletter

13   constituted evidence giving rise to a breach of contract claim for the first time, plaintiff waited

14   approximately 14 months after discovery of that evidence to file a motion for leave to amend his

15   pleadings to add that claim.  That substantial delay shows that plaintiff was not diligent in seeking

16   amendment to add a new claim.  *See AmerisourceBergen Corp.*, 465 F.3d at 953 ("We have held

17   that an eight-month delay between the time of obtaining a relevant fact and seeking a leave to

18   amend is unreasonable."); *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1087 (9th Cir. 2002)

19   (affirming the district court's finding that a four-month delay in seeking amendment of a

20   scheduling order was too long to establish "good cause" under Rule 16(b)); *Brown v. Brown*, No.

21   11-cv-06897-JFW-RZX, 2012 WL 13008999, at *2 (C.D. Cal. Feb. 14, 2012) (declining to

22   modify scheduling order and permit amendment to the pleadings when plaintiff filed his motion

23   "more than two months after the deadline for filing such a motion had passed" and "all of the

24   information was available to [plaintiff] prior to the issuance of the [case management order]").

25   Plaintiff seeks to justify his delay in several ways.  First, plaintiff argues the 14-month

26   delay was justified because he raised the general issue of amending his pleadings in joint status

27   reports filed with the court.  (Doc. No. 52-1 at 13–14.)  But those joint status reports failed to

28   mention that plaintiff was contemplating adding a new claim, a point conceded by plaintiff at the

8

hearing and in his papers.  (Doc. Nos. 51-2 at 14; 60 at 8.)  Even though plaintiff received the "Bonneville Beat" newsletter in March 2022, he made no mention of his desire to add a breach of contract claim in three subsequent joint status reports filed with the court in April, July, and October of 2022.  (*See* Doc. Nos. 28 at 3; 33 at 3; 40 at 3.)  At most, in those joint status reports, plaintiff merely reserved a general right to amend his first amended complaint in response to defendant's pending motion to dismiss if it was granted, which means that leave to amend would have been limited to the legal issues raised in that motion to dismiss.  (*See, e.g.*, Doc. No. 40 at 3) ("Although Plaintiff contends that Defendant's motion to dismiss is unwarranted, Plaintiff requests an opportunity to further amend the First Amended Complaint *if any portion of the motion is granted*.") (emphasis added).

Next, plaintiff contends that he was faced with a "procedural dilemma" of needing to file a motion for leave to amend while a motion to dismiss was already pending.  (Doc. No. 52-1 at 14–15.)  Due to this "procedural dilemma," plaintiff erroneously believed that "the proper order and procedure would be to seek amendment immediately after the ruling on Defendant's Motion to Dismiss."  (*Id.* at 15) (citing *Hunt v. Washoe Cnty. Sch. Dist.*, No. 3:18-cv-00501-LRH-WGC, 2019 WL 4262510, at *10 (D. Nev. Sept. 9, 2019)).[1]  However, as the court explained at the hearing, plaintiff faced no dilemma because defendant's then-pending motion to dismiss and plaintiff's desire to amend the pleadings to add a new claim were simply not related.  Plaintiff's "procedural dilemma" also ignores that the good cause standard requiring that a party must be diligent in seeking to modify a scheduling order includes no caveat or exception for when other motions are pending.  *See Williams v. James River Grp. Inc.*, 627 F. Supp. 3d 1172, 1177 (D. Nev. 2022) ("'The diligence obligation is ongoing' . . . [and although] [t]he showing of diligence

---

[1]  Plaintiff's citation to the decision in *Hunt* is inapposite.  Although the district court in *Hunt* denied plaintiff's pending motion to amend as "premature" and noted that "such motions should be made if and when the court grant's a defendant's motion to dismiss," that particular motion to amend came in opposition to a pending motion to dismiss and did not seek to "bring 'new causes of action,' 'new allegations,' or 'new theories,' but rather simply [sought] to clarify certain parts of her complaint" in response to a motion to dismiss.  *Hunt*, 2019 WL 4262510, at *10.  In contrast, here, plaintiff is seeking to add a new claim that was not addressed in the then-pending motion to dismiss.

is measured by the conduct displayed throughout the entire period of time already allowed. . . carelessness is not compatible with a finding of diligence and offers no reason for a grant of relief.") (internal citations omitted).  At bottom, based on plaintiff's own motion papers and his counsel's statements at the hearing, plaintiff waited 14 months to bring the pending motion to add a new breach of contract claim and never advised the court of his intention to do so.[2]  The court cannot reasonably conclude that this demonstrates diligence.  *See AmerisourceBergen Corp.*, 465 F.3d at 953; *Zivkovic*, 302 F.3d at 1087; *Brown*, 2012 WL 13008999, at *2.

Therefore, plaintiff's pending motion to modify the scheduling order will be denied because he failed to demonstrate that he acted diligently in seeking to modify the scheduling order to amend his pleadings in order to add a new claim for breach of contract.  Because plaintiff has failed to satisfy the good cause standard under Rule 16, the court need not address whether justice requires leave to amend the pleadings under Rule 15.[3]  *See Jackson*, 186 F.R.D. at 607

/////

---

[2]  To the extent plaintiff contends that the court's delay in ruling on the previous motion to dismiss caused the delay in his seeking amendment, that contention is not well-taken.  (Doc. No. 52-1 at 14–15.)  Not only are the two motions independent of one another as explained above, but plaintiff was notified that the court was severely backlogged and unlikely to address the then-pending motion to dismiss promptly:  on January 3, 2023, after the motion to dismiss had been fully submitted eleven months earlier, the court issued a minute order alerting the parties that upon transferring to the Sacramento courthouse he was reassigned a caseload "with a substantial backlog of over 100 fully briefed motions" and encouraging the parties to consider consenting to magistrate judge jurisdiction.  (Doc. No. 43.)  Nevertheless, plaintiff still waited nearly five additional months to act after receiving that minute order.

[3]  The court acknowledges one final argument raised by plaintiff, in his pending motion and at the hearing:  "even if Plaintiff had filed the Motion to Amend sometime in 2022 or earlier in 2023, there is no reason to conclude that the duration of the District Court's review of Defendant's Motion to Dismiss would have been any shorter, or that the lawsuit would be in any different procedural posture . . . ."  (Doc. No. 52-1 at 15–16.)  As an initial matter, whether or not that assertion is correct is not relevant because it does not address the applicable legal standard of diligence.  *See Johnson*, 975 F.2d at 610 ("A scheduling order 'is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril.'") (citation omitted).  Moreover, plaintiff's argument in this regard is entirely speculative—there is no way to know how this case would have proceeded if a motion to amend had been timely filed.  Despite the delay in resolving the motion to dismiss, the docket reflects that this court has been actively managing this case.  (*See* Doc. Nos. 21, 29, 32, 34, 41, 43, 47.)  It is equally plausible, for example, that a timely motion to amend by plaintiff would have resulted in a more expeditious resolution of both motions by the court.

("[A] motion seeking to amend pleadings is governed first by Rule 16(b), and only secondarily by Rule 15(a).").

**B.     Defendant's Motion to Dismiss the Second Amended Complaint**

As noted, defendant moves to dismiss plaintiff's second amended complaint in its entirety. First, the court will address defendant's challenge to plaintiff's religious discrimination claim; second, it will turn to plaintiff's retaliation claim brought under California Labor Code §§ 1101 and 1102; and third, it will consider plaintiff's wrongful termination in violation of public policy claim, which is derivative of plaintiff's other two claims.

1.     Legal Standard

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the legal sufficiency of the complaint. *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983). "Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). A plaintiff is required to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In determining whether a complaint states a claim on which relief may be granted, the court accepts as true the allegations in the complaint and construes the allegations in the light most favorable to the plaintiff. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). However, the court need not assume the truth of legal conclusions cast in the form of factual allegations. *U.S. ex rel. Chunie v. Ringrose*, 788 F.2d 638, 643 n.2 (9th Cir. 1986). While Rule 8(a) does not require detailed factual allegations, "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. A pleading is insufficient if it offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 676 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Moreover, it is

11

1   inappropriate to assume that the plaintiff "can prove facts that it has not alleged or that the

2   defendants have violated the . . . laws in ways that have not been alleged." *Associated Gen.*

3   *Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

4          2.      Religious Discrimination under FEHA (Claim 2)

5          Defendant moves to dismiss plaintiff's FEHA claim for discrimination on the basis of

6   religion.  (Doc. No. 56 at 12–16.)

7          Under the FEHA, it is unlawful for an employer "to discriminate against [a] person in

8   compensation or in terms, conditions, or privileges of employment" because of a person's

9   religious creed.  Cal. Gov't. Code § 12940(a).  To establish a prima facie case of discrimination

10  under the FEHA, a plaintiff must ultimately show that:  (i) he was a member of a protected class;

11  (ii) he was qualified for the position he sought or was performing competently in the position he

12  held; (iii) he suffered an adverse employment action, such as a termination; and (iv) some other

13  circumstances that suggest a discriminatory motive.  *See Lawler v. Montblanc N. Am., LLC*, 704

14  F.3d 1235, 1242 (9th Cir. 2013); *Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 355 (2000); *see also*

15  *Roby v. McKesson Corp.*, 47 Cal. 4th 686, 706 (2009).  Although this prima facie framework is

16  "an evidentiary framework and not a pleading standard," it serves as "a useful touchstone in

17  evaluating whether plaintiff has a plausible claim." *Duke v. City Coll. of San Francisco*, 445 F.

18  Supp. 3d 216, 232 (N.D. Cal. 2020).

19         As to the fourth element, plaintiff can demonstrate an employer's discriminatory motive

20  through direct evidence, or by offering "circumstantial evidence of discrimination that tends to

21  show that the employer's proffered motives were not the actual motives because they are

22  inconsistent or otherwise not believable." *Achal v. Gate Gourmet*, 114 F. Supp. 3d 781, 801

23  (N.D. Cal. July 14, 2015) ("Applying California law, the Ninth Circuit has held that a mere

24  comment suggesting the existence of bias can be direct evidence of discriminatory animus."); *see*

25  *also Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221–22 (9th Cir. 1998).  At the pleadings

26  stage, a plaintiff must allege some facts supporting the inference that his termination was because

27  of his religion. *See Whitehead v. Pacifica Senior Living Mgmt. LLC*, No. 21-15035, 2022 WL

28  313844, at *2 (9th Cir. Feb. 2, 2022); *Broadnax v. Adams & Assocs., Inc.*, 817 F. App'x 512, 513

1    (9th Cir. 2020);[4] *see also Mayes v. Kaiser Found. Hosps.*, 917 F. Supp. 2d 1074, 1079 (E.D. Cal.

2    2013) (granting a motion to dismiss plaintiff's discrimination claim because the complaint lacked

3    "meaningful detail suggesting the termination was because of [plaintiff being a member of a

4    protected class]").

5          In moving to dismiss, defendant argues that plaintiff fails to allege any facts indicating

6    that it knew or had reason to know that plaintiff was a member of the Unitarian Universalist

7    Church or that plaintiff's May 31, 2020 tweet was an expression of his religious beliefs, and thus,

8    plaintiff has failed to state a plausible claim that it terminated him on that basis.  (Doc. No. 56 at

9    13–15.)  According to defendant, plaintiff's new allegations merely suggest that his co-workers

10   and two co-hosts were aware of his religious beliefs, not that defendant or any person's involved

11   with plaintiff's termination were aware of them.  (*Id.* at 14.)  The court agrees.  While the

12   allegations of the SAC identify the specific individuals who were involved in plaintiff's

13   termination (*see* Doc. No. 49 at ¶ 67), there is no allegation (or inference to be drawn from

14   plaintiff's allegations) that those individuals were aware of plaintiff's religious beliefs.  Indeed,

15   plaintiff alleges that he "always kept his religious and political beliefs to himself during radio

16   broadcasts," and only communicated his religious beliefs to "former co-host, Mike Lamb, as well

17   as Doug Christie" and "his co-workers."  (*Id.* at ¶¶ 28–29.)  These alleged facts are an insufficient

18   basis from which to draw an inference that individuals making the decision to terminate plaintiff

19   were aware of his religious beliefs, let alone that those same individuals terminated plaintiff due

20   to his religious beliefs.  *Cf. Achal*, 114 F. Supp. 3d at 801–02 (finding that the plaintiff had stated

21   a plausible religious discrimination claim where he alleged facts giving rise to the inference that

22   his supervisor was aware of his Hindu faith); *Viloria v. Adams & Assocs., Inc.*, No. 2:16-cv-

23   00314-TLN-KJN, 2017 WL 4422363, at *4 (E.D. Cal. Oct. 5, 2017) (finding that the plaintiff had

24   stated a plausible religious discrimination claim because the complaint alleged that plaintiff

25   "informed Defendant she was religious and that she used her breaks to pray"); *see also Avila v.*

26   *Cont'l Airlines, Inc.*, 165 Cal. App. 4th 1237, 1250 (2008) (explaining that under California law,

27

_____

28   [4]  Citation to these unpublished Ninth Circuit opinions is appropriate pursuant to Ninth Circuit
     Rule 36-3(b).

1    knowledge of an employee's disability by co-workers is not automatically imputed onto that

2    employee's supervisors absent some other factual basis).

3         In addition, despite plaintiff's conclusory allegation that his tweet was self-evidently

4    religious (Doc. No. 49 at ¶ 56), the court does not agree that the purported religious nature of

5    plaintiff's tweet was self-evident, and plaintiff's mere allegation that it was does not make it so.

6    As defendant points out, there is nothing contained in the tweet itself, such as a quotation to

7    scripture, the principles of the unitarian church, other religious moniker, or a reference to

8    plaintiff's own religion, indicating that the tweet was in any way religious in nature.  (Doc. No.

9    56 at 14–15.)  In fact, the SAC suggests that plaintiff's interpretation of his tweet as a statement

10   of religious beliefs was based on his own unique perspective.  (*See* Doc. No. 49 at ¶ 55) (alleging

11   that "[*f*]*rom Plaintiff GRANT NAPEAR'S perspective as a Christian*, the message 'ALL LIVES

12   MATTER…EVERY SINGLE ONE' reflects [a] Christian religious belief . . .").

13        Nevertheless, it appears at least possible that defendant would have been aware of

14   plaintiff's religious beliefs after he published the May 31, 2020 tweet because plaintiff alleges

15   that defendant received "written comments, emails and letters" from members of the public

16   recognizing that the tweet was construed as being religious in nature by some individuals.  (*See*

17   Doc. No. 49 at ¶ 56.)  At the hearing, however, plaintiff's counsel explained that he could not

18   allege whether defendant—and specifically, the seven individuals alleged to have been involved

19   in terminating plaintiff's employment—received those written comments before plaintiff was

20   terminated.  Indeed, the time for such communications to reach defendant before plaintiff was

21   terminated was incredibly brief:  plaintiff published the tweet on a Sunday evening and was

22   terminated by Tuesday.  The mere 36 hours or so that passed from tweet to termination are not

23   circumstances from which the court can infer that "written comments, emails and letters" alerted

24   /////

25   /////

26   /////

27   /////

28   /////

14

1    defendant's decisionmakers to the potential religious nature of plaintiff's May 31, 2020 tweet.[5]

2           For these reasons, plaintiff's allegations do not plausibly suggest that defendant was

3    alerted to the potentially religious nature of plaintiff's tweet or plaintiff's membership in the

4    Unitarian Universalist Church prior to making the decision to terminate plaintiff's employment.

5    Thus, the facts alleged in the SAC do not give rise to the inference that plaintiff's termination

6    could have been based on religious animus.  *See Lewis v. United Parcel Serv., Inc.*, 252 F. App'x

7    806, 808 (9th Cir. 2007)[6] (explaining that an employer who had not been informed of the

8    plaintiff's religious reasons for cutting his hair until after the purported adverse employment

9    action occurred meant that plaintiff could not establish his religious discrimination claim); *cf.*

10   *Viloria*, 2017 WL 4422363, at *4 (finding that allegations supported a plausible inference of

11   discriminatory motive where plaintiff had alleged "that Defendant fired her for sleeping on the

12   job when she was not on the job but on a break, she was known to pray on her breaks, she

13   explained this to Defendant at the time, and Defendant made no effort to investigate this

14   discrepancy").

15          Thus, the court concludes that plaintiff has failed to state a plausible claim for religious

16   discrimination because plaintiff's allegations do not support an inference that defendant was

17   alerted to the purported religious nature of plaintiff's tweet, or plaintiff's religion more generally,

18   before defendant terminated plaintiff.  Absent the allegation of facts giving rise to an inference

19   that plaintiff's termination was based on religious animus, defendant's motion to dismiss

20   plaintiff's religious discrimination claim will be granted.

21   ────────────────────

     [5]  Additionally, plaintiff alleged on information and belief "that the person hired by [defendant] . .

22   . to replace Plaintiff was not a member of the Unitarian Universalist Church."  (Doc. No. 49 at ¶

23   57.)  However, the court agrees with defendant that due to the absence of any other alleged facts,
     this allegation is conclusory, based solely on information and belief, and is therefore insufficient

24   as a matter of law.  *See Tarantino v. Gawker Media, LLC*, No. 14-cv-00603-JFW-FFM, 2014 WL
     2434647, at *5 n.4 (C.D. Cal. Apr. 22, 2014) (noting that plaintiff's allegations "based on

25   information and belief . . . are insufficient as a matter of law"); *see also Blantz v. California Dep't
     of Corr. & Rehab., Div. of Corr. Health Care Servs.*, 727 F.3d 917, 926–27 (9th Cir. 2013)

26   (explaining that conclusory allegations made "on information and belief" were insufficient to
     allege state law tort claim).

27

     [6]  Citation to these unpublished Ninth Circuit opinions is appropriate pursuant to Ninth Circuit

28   Rule 36-3(b).

                                                      15

Although plaintiff requests further leave to amend in his opposition to the pending motion to dismiss, the court will not grant such leave as to plaintiff's religious discrimination claim. The court previously granted plaintiff leave to amend this claim in a detailed written order that thoroughly explained the deficiencies of plaintiff's FAC in attempting to state this claim. (Doc. No. 48 at 9–14); *see Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015) ("It is black-letter law that a district court must give plaintiffs at least one chance to amend a deficient complaint, absent a clear showing that amendment would be futile."). Notwithstanding the court's detailed explanation, plaintiff's religious claim remains deficiently alleged in the SAC. Although at the hearing plaintiff proffered one additional new fact that he could allege,[7] the court does not find that the proffered fact would give rise to the inference that there was any connection between plaintiff's alleged religious beliefs and his termination. *See Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1041 (9th Cir. 2011) ("[A] district court may dismiss without leave where a plaintiff's proposed amendments would fail to cure the pleading deficiencies and amendment would be futile."); *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."). For these reasons, the court concludes that granting further leave to amend as to this claim would be futile and plaintiff's request for leave to amend his religious discrimination claim will be denied. *See Mir v. Fosburg*, 646 F.2d 342, 347 (9th Cir. 1980) ("[A] district court has broad discretion to grant or deny leave to amend, particularly where the court has already given a plaintiff one or more opportunities to amend his complaint to allege federal claims.").

3.    California Labor Code §§ 1101 and 1102 (Claim 3)

Next, defendant moves to dismiss plaintiff's retaliation claims brought under California Labor Code §§ 1101 and 1102. (Doc. No. 56 at 17–22.)

/////

/////

---

[7] Specifically, plaintiff's counsel stated at the hearing that plaintiff could allege that his termination was based in part on information defendant received from plaintiff's co-host.

16

1       In 1937, "the California Legislature, recognizing that employers could misuse their

2  economic power to interfere with the political activities of their employees, enacted Labor Code

3  sections 1101 and 1102 to protect the employees' rights." *Gay L. Students Ass'n. v. Pac. Tel. &*

4  *Tel. Co.*, 24 Cal. 3d 458, 486–87 (1979) *superseded by statute as stated in In re Marriage Cases*,

5  43 Cal. 4th 757, 835 n.56 (2008).  California Labor Code § 1101 provides that "[n]o employer

6  shall make, adopt, or enforce any rule, regulation, or policy:  (a) Forbidding or preventing

7  employees from engaging or participating in politics . . . [or] (b) Controlling or directing, or

8  tending to control or direct the political activities or affiliations of employees."  Cal. Lab. Code

9  § 1101.  Similarly, § 1102 provides that "[n]o employer shall coerce or influence or attempt to

10  coerce or influence his employees through or by means of threat of discharge or loss of

11  employment to adopt or follow or refrain from adopting or following any particular course or line

12  of political action or political activity."  Cal. Lab. Code § 1102.  "These sections serve to protect

13  'the fundamental right of employees in general to engage in political activity without interference

14  by employers.'"  *Gay L. Students Ass'n*, 24 Cal. 3d at 487 (citation omitted); *see also Couch v.*

15  *Morgan Stanley & Co.*, No. 1:14-cv-00010-LJO-JLT, 2015 WL 4716297, at *11 (E.D. Cal. Aug.

16  7, 2015) ("Sections 1101 and 1102 therefore 'prohibit an employer from attempting to coerce or

17  influence its employees' political activities through the threat of discharge . . . [and] [t]he purpose

18  of sections 1101 and 1102 [] is 'to protect employees' political freedom.'") (quoting *Nava v.*

19  *Safeway Inc.*, No. F063775, 2013 WL 3961328, at *8 (Cal. Ct. App. July 31, 2013) (unpublished)

20  and *Wade v. Rackauckas*, No. G034650, 2006 WL 1086259, at *4 (Cal. Ct. App. Apr. 26, 2006)

21  (unpublished)), *aff'd*, 656 F. App'x 841 (9th Cir. 2016).[8]  Employees can assert a private action

22  against their employers under §§ 1101 and 1102.  *See* Cal. Lab. Code § 1005; *Lockheed Aircraft*

23  *Corp. v. Superior Ct. of Los Angeles Cnty.*, 28 Cal. 2d 481, 486 (1946).

---

[8]  The Ninth Circuit has stated that federal courts "may consider unpublished state decisions, even though such opinions have no precedential value."  *Emp'rs Ins. of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1220 n.8 (9th Cir. 2003) (citing *Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 943 n.4 (9th Cir. 1997)); *see also Couch*, 2015 WL 4716297, at *11 ("Given the dearth of relevant published decisions concerning [California Labor Code] sections 1101 and 1102, the Court must resort to unpublished ones."); *Couch v. Morgan Stanley & Co. Inc.*, 656 F. App'x 841, 842–43 (9th Cir. 2016) (citing *Nava*, 2006 WL 1086259, at *4).

17

Importantly, "liability under §§ 1101(a) and 1102 is triggered only if an employer fires an employee based on a political motive." *Couch*, 656 F. App'x at 843.  For purposes of §§ 1101 and 1102, the California Supreme Court has defined "political activity" "as extending beyond 'partisan activity' to include 'the espousal of a candidate *or a cause*, and some degree of action to promote the acceptance thereof by other persons.'" *Ross v. Indep. Living Res. of Contra Costa Cnty.*, No. 08-cv-00854-TEH, 2010 WL 2898773, at *9 (N.D. Cal. July 21, 2010) (quoting *Gay L. Students Assn.*, 24 Cal. 3d at 487).

In the pending motion to dismiss, defendant contends that plaintiff has failed to state a plausible claim under §§ 1101 and 1102 because he has not alleged that (i) defendant had a "rule, regulation, or policy" within the meaning of § 1101; (ii) that the May 31, 2020 tweet constituted "political activity"; and (iii) defendant's motivation in terminating plaintiff was political.  (Doc. Nos. 56 at 17–22; 62 at 13–17.)  Further, to the extent plaintiff has alleged facts speaking to these elements, defendant contends that plaintiff's allegations are internally contradictory and/or are contradicted by purported "judicial admissions" plaintiff made in his motion to modify the court's scheduling order.  (Doc. Nos. 56 18–20; 62 at 13–15.)

First, defendant argues that plaintiff fails to allege a requisite policy without contradicting himself.  (Doc. No. 56 at 17–18.)  However, the court finds that plaintiff has sufficiently alleged a "rule, regulation, or policy" under § 1101 by alleging in the SAC that defendant used his termination "as an example to all other employees of the Company as an implicit warning that anyone that dared to speak out publicly and criticize the politics of the Black Lives Matter movement would be summarily terminated."  (*See* Doc. No. 49 at ¶ 69); *Surdak v. DXC Tech.*, No. 5:22-cv-00921-SB-KK, 2022 WL 18142545, at *7 (C.D. Cal. Dec. 20, 2022) (finding that "a reasonable jury could conclude that [the employer] disagreed with the political views expressed in or suggested by the tweet [concerning Lyndon Baines Johnson] and wanted to punish Plaintiff for, or discourage other employees from, expressing similar speech"); *Nava*, 2013 WL 3961328, at *8 (explaining that if plaintiff alleged that he "was fired for his particular political perspective . . . [of] being against same-sex marriage . . . it may be inferred that . . . [the employer] was in effect declaring that the espousal or advocacy of such political views will not be tolerated—then

18

1   [the employer's] action constituted a violation of Labor Code sections 1101 and 1102").  In

2   addition, the court declines to exercise its discretion to consider the purported "judicial

3   admission" asserted in plaintiff's motion to modify the scheduling order and for leave to file a

4   third amended complaint, thereby rendering moot defendant's contention that plaintiff has

5   contradicted his own allegations.  *See Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 227 (9th

6   Cir. 1988) ("We agree and hold that statements of fact contained in a brief *may* be considered

7   admissions of the party in the discretion of the district court.").

8           Second, defendant argues that plaintiff fails to allege that the tweet amounts to "political

9   activity" under §§ 1101 and 1102 because his allegations regarding the political nature of his May

10  31, 2020 tweet are also contradictory.  (Doc. Nos. 56 at 18; 62 at 14.)  The court disagrees.  In the

11  SAC, plaintiff alleges that the tweet "was a personal expression of . . . [his] political opinion and

12  ideology" and was "not (and never was intended to be) a specific rejection, repudiation or denial

13  of the importance of the Black Lives Matter political movement or BLM's political message that

14  'Black Lives Matter.'" (Doc. No. 49 at ¶ 63.)  Rather, as plaintiff alleges, he was expressing a

15  political message "encouraging other members of society to adopt and follow a more inclusive

16  political belief and point of view compared to the less inclusive political message of the Black

17  Lives Matter political movement." (*Id.*)  Plaintiff's further allegation that defendant interpreted

18  his tweet as "anti-BLM" does not, as defendant maintains, contradict plaintiff's other allegations

19  regarding his explanation of the intended political message of his tweet.  (Doc. No. 56 at 19.)  In

20  other words, defendant's argument in this regard conflates plaintiff's nuanced explanation of his

21  tweet with an outright contradiction.  Moreover, stepping back from defendant's granular

22  perspective, the court finds that plaintiff's tweet at issue in this case can be considered facially

23  political in nature when construed in the light most favorable to plaintiff:  it contained the phrase

24  "All Lives Matter" in response to the question "What's your take on BLM?"; was published by

25  public figures—plaintiff, a popular sports radio host, in response to, Mr. Cousins, a well-known

26  professional basketball player; and the tweet was made just days after George Floyd's death.  The

27  foregoing allegations, particularly when construed in the light most favorable to plaintiff, are

28  sufficient to allege that plaintiff's tweet was political speech regarding a specific cause, and that

plausibly constitutes political activity under §§ 1101 and 1102.  *See Gay L. Students Assn.*, 24 Cal. 3d at 487–88 (explaining that "political activity" "connotes the espousal of . . . a cause, and some degree of action to promote acceptance thereof by other persons," such as "participation in litigation," "the wearing of symbolic armbands," and "the association with others for the advancement of beliefs and ideas").

Third, defendant contends that plaintiff fails to sufficiently allege that its motive in terminating plaintiff was political.  (Doc. No. 56 at 20.)  Defendant argues plaintiff's termination was for a "legitimate, apolitical reason," specifically, that plaintiff's "'social media use is inseparably connected with the Company's public image and reputation' and his 'statements are likely to discredit the goodwill, good name, and reputation of Bonneville.'"  (*Id.*) (quoting Doc. No. 52-2 at 34).  Defendant also argues in its pending motion that "negative responses and reactions to the Tweet on Twitter support Bonneville's stated reason for the termination."  (*Id.*) (citing Doc. No. 16-1).  As the court explained at the hearing, defendant has presented an argument that is more appropriate for consideration on summary judgment.  The facts that defendant has drawn from in order to assert its alternative narrative regarding plaintiff's termination are not before the court on this motion to dismiss.  Indeed, defendant quotes from plaintiff's termination letter, which defendant contends constitutes a judicial admission merely because plaintiff attached a copy of that letter as an exhibit, not to his SAC, but to a declaration filed in support of his motion to modify the scheduling order.  (Doc. No. 56 at 10 n.3).

As noted above, the court will exercise its discretion to reject considering that termination letter as a judicial admission.  *See Am. Title Ins. Co.*, 861 F.2d at 227; *Nat'l Abortion Fed'n v. Ctr. for Med. Progress*, 134 F. Supp. 3d 1199, 1206 (N.D. Cal. 2015) ("Trial courts have discretion to accept or reject a judicial admission.") (citing *Singer v. State Farm Mut. Auto. Ins. Co.*, 116 F.3d 373, 376 (9th Cir. 1997)).  Moreover, although the court granted defendant's request for judicial notice of "two news articles and [a] compilation of tweets in response to plaintiff's May 31, 2020 tweet," it did so "'solely as an indication of what information was in the public realm at the time' and not as to whether the contents of those articles or tweets are in fact true."  (Doc. No. 48 at 9.)  Thus, defendant's alternative narrative regarding the reason that

1    plaintiff was terminated relies on materials outside the SAC or are beyond the scope of judicial

2    noticed facts, and, thus, are not properly before the court on the pending motion to dismiss.  *See*

3    *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 925 (9th Cir. 2001) (rejecting

4    consideration of "evidence outside the complaint" because "such extraneous evidence should not

5    be considered in ruling on a motion to dismiss").

6         At the same time, however, the allegations of plaintiff's SAC address the pleading

7    deficiencies that this court previously identified and include newly alleged facts plausibly

8    indicating that plaintiff's termination was politically motivated.  To begin with, plaintiff alleges

9    that his termination occurred less than 48 hours after the tweet was published by plaintiff.  (Doc.

10   No. 49 at ¶¶ 30–35.)  Following plaintiff's swift termination, defendant issued a public statement

11   explaining that plaintiff's "recent comments about the Black Lives Matter movement do not

12   reflect the views or values of Bonneville International Corporation" and noting that the tweet's

13   timing of occurring days after George Floyd's death "was particularly insensitive."  (*Id.* at ¶ 38.)

14   Moreover, plaintiff alleges that defendant used his termination "as an example" and "implicit

15   warning" to those that "dared to speak out publicly and criticize the politics of the Black Lives

16   Matter movement," which allegedly caused "several employees" to register "internal complaints"

17   to defendant based on a concern that defendant was sending its employees this exact message.

18   (*Id.* at ¶ 69.)  Finally, plaintiff alleged that there were seven individuals involved in his

19   termination on behalf of defendant, and that each of them "objected to Plaintiff's May 31, 2020

20   tweet because of the political and/or religious nature of Plaintiff's six-word public message" and

21   "expressed negative emotion . . . based on Plaintiff's public political message that 'ALL LIVES

22   MATTER…EVERY SINGLE ONE.'"  (*Id.* at ¶ 67.)  Collectively, these allegations are sufficient

23   to plausibly suggest that plaintiff's termination was motivated by plaintiff's political activity of

24   posting a tweet containing a certain message.  *See Ross v. Indep. Living Res. of Contra Costa*

25   *Cnty.*, No. 08-cv-00854-TEH, 2010 WL 1266497, at *1–2, *6 (N.D. Cal. Apr. 1, 2010) (finding

26   that the plaintiff sufficiently stated a claim under § 1101 by alleging that his employer terminated

27   him days after learning he brought a disability access lawsuit against a recreational facility,

28   causing it to temporarily close, which generated news and internet coverage).  In light of these

1   new allegations, defendant's proffered reason for plaintiff's termination—that it was an apolitical

2   business decision—is not so convincing such that it renders plaintiff's version of events

3   implausible.[9]  *See id.* (finding allegations in the complaint sufficient to state a claim even though

4   the plaintiff's termination was for purported "budget problems" according to his employer); *see*

5   *also Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014)

6   ("Plaintiff's complaint may be dismissed only when defendant's plausible alternative explanation

7   is so convincing that plaintiff's explanation is *implausible.*").

8        Thus, the court concludes that plaintiff has stated a plausible claim for retaliation under

9   California Labor Code §§ 1101 and 1102.  Accordingly, defendant's motion to dismiss plaintiff's

10  retaliation claim will be denied.

11       4.      <u>Wrongful Termination in Violation of Public Policy (Claim 1)</u>

12       Finally, defendant seeks to dismiss plaintiff's claim of wrongful termination in violation

13  of public policy because it is derivative of plaintiff's other claims, which defendant contends are

14  all insufficiently pled.  (Doc. No. 56 at 22–23.)

15       As a matter of California common law, "when an employer's discharge of an employee

16  violates fundamental principles of public policy, the discharged employee may maintain a tort

17  action and recover damages traditionally available in such actions."  *Tameny v. Atl. Richfield Co.*,

18  27 Cal. 3d 167, 170 (1980); *see also Freund v. Nycomed Amersham*, 347 F.3d 752, 758 (9th Cir.

19  2003).  To prevail on a claim for wrongful discharge, a plaintiff must show that:  (1) an employer-

20  employee relationship existed; (2) plaintiff's employment was terminated; (3) the violation of

21  public policy was a motivating factor for the termination; and (4) the termination was the cause of

22  plaintiff's damages.  *Haney v. Aramark Unif. Servs., Inc.*, 121 Cal. App. 4th 623, 641 (2004); *see*

23  *also Wright v. Thrifty Payless, Inc.*, No. 2:13-cv-01681-KJM, 2013 WL 5718937, at *5 (E.D. Cal.

24  Oct. 15, 2013).  Here, plaintiff alleges that he was terminated "in violation of the public policy set

25  forth in the California Fair Employment and Housing Act, California Government Code section

26  ───────────────

27  [9]  In addition, contrary to defendant's contention, the court does not view plaintiff's current
    allegations as being contradicted by other allegations that defendant believed the tweet was "anti-
    BLM" or that defendant terminated plaintiff to "curry favor with the power Black Lives Matter
28  political movement."  (Doc. No. 56 at 21.)

12940, *et seq.*, as well as California Labor Code sections 1101 and 1102." (Doc. No. 49 at ¶ 47.) As discussed above, the court has concluded that plaintiff has failed to adequately allege his discrimination claim brought under FEHA but has stated a plausible retaliation claim brought under California Labor Code §§ 1101 and 1102. Thus, plaintiff's derivative claim for wrongful termination in violation of public policy will be dismissed to the extent that claim is derivative of his religious discrimination claim; plaintiff's wrongful termination claim may proceed to the extent it relies on his California Labor Code §§ 1101 and 1102 claim. *See Whitehead*, 2022 WL 313844, at *2 (dismissing a "derivative" "wrongful discharge in violation of public policy" claim where the plaintiff failed to plausibly allege a claim of discrimination); *Dauth v. Convenience Retailers, LLC*, No. 13-cv-00047-MEJ, 2013 WL 5340396, at *3 (N.D. Cal. Sept. 24, 2013) (dismissing a wrongful termination in violation of public policy claim to the extent it rested on an asserted violation of the fundamental public policy established by a California Labor Code retaliation statute).

Accordingly, defendant's motion to dismiss plaintiff's wrongful termination claim will be granted in part and denied in part.

## CONCLUSION

For the reasons explained above,

1.    The court denies plaintiff's motion to modify the scheduling order and for leave to file a third amended complaint (Doc. No. 52);

2.    The court grants in part and denies in part defendant's motion to dismiss (Doc. No. 56) as follows:

    a.    The court grants defendant's motion to dismiss plaintiff's religious discrimination claim without leave to amend;

    b.    The court denies defendant's motion to dismiss plaintiff's retaliation claim under California Labor Code §§ 1101 and 1102;

/////

/////

/////

1     c.  The court grants defendant's motion to dismiss plaintiff's wrongful

2        termination in violation of public policy claim to the extent it is predicated

3        on an alleged violation of the public policy set forth in the California Fair

4        Employment and Housing Act;

5     d.  The court denies defendant's motion to dismiss plaintiff's wrongful

6        termination in violation of public policy claim to the extent it is predicated

7        on an asserted violation of the public policy set forth in California Labor

8        Code §§ 1101 and 1102; and

9   3.  Within twenty-one (21) days from the date of entry of this order, defendant shall

10     file a responsive pleading.

11  IT IS SO ORDERED.

12 Dated:  **July 24, 2023**

13               UNITED STATES DISTRICT JUDGE

24