1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9               FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   GRANT NAPEAR,                          No. 2:21-cv-01956-DAD-SCR

12              Plaintiff,

13        v.                                ORDER GRANTING DEFENDANT'S
                                            MOTION FOR SUMMARY JUDGMENT
14   BONNEVILLE INTERNATIONAL
     CORPORATION,                           (Doc. Nos. 74, 95)
15
                Defendant.
16

17

18        This matter is before the court on the motion for summary judgment filed on behalf of

19   defendant on May 29, 2024.  (Doc. No. 74.)  The pending motion was taken under submission

20   pursuant to Local Rule 230(g).  (Doc. No. 88.)  For the reasons explained below, defendant's

21   motion for summary judgment will be granted.

22                              **BACKGROUND**[1]

23        This case arises from plaintiff's allegations of retaliation and wrongful termination against

24   defendant Bonneville International Corporation ("Bonneville"), his former employer.  (Doc. No.

25   49.)

26   ───────────────
     [1]  The relevant facts that follow are undisputed unless otherwise noted and are derived largely
27   from the undisputed facts as stated by defendant and responded to by plaintiff (Doc. No. 82
     ("DUF")), as well as the purportedly disputed facts as stated by plaintiff and responded to by
28   defendant (Doc. No. 91 ("PUF")).

                                            1

## A.     Factual Background

On October 31, 2019, plaintiff Napear signed an employment agreement with defendant Bonneville for a one-year term of employment from August 1, 2019 through July 31, 2020 (the "Employment Agreement").  (DUF ¶ 4.)  Defendant is a media company that operates radio and television stations, websites, and podcasts offering news, sports, and other programming.  (DUF ¶ 1.)  Defendant's stated purpose is to build up, connect, inform, and celebrate communities and families.[2]  (DUF ¶ 2.)  Defendant's radio station in Sacramento, KHTK, is the flagship home of the Sacramento Kings NBA basketball team.  (DUF ¶ 3.)  The centerpiece of the KHTK station is the broadcasting of Kings play-by-play and content related to the team.  (*Id.*)  Plaintiff was the host and on-air talent of a daily radio show at KHTK.[3]  (DUF ¶ 5; Doc. No. 95-1 at 2.)  Defendant was the sole and exclusive owner of the Show and any content or rights related to it.  (DUF ¶ 6.)  Plaintiff was also employed by the Sacramento Kings as the play-by-play announcer for team.  (DUF ¶ 7.)

/////

---

[2]  Plaintiff argues that defendant's stated purpose is disputed because defendant's website "lists a variety of different, varied and interrelated missions, goals and aspirations."  (DUF ¶ 2.)  In support of this contention, plaintiff includes a link to defendant's website's "About Us" page.  (*Id.*)  The court has viewed the link, and the webpage clearly states that defendant is "dedicated to building up, connecting, informing and celebrating families and communities" and "is committed to adding to the sum of good in the world with a mission to be trusted voices of light and truth influencing hundreds of millions of people worldwide."  *See* Bonneville "About Us" at https://bonneville.com/about-us.  Accordingly, the court finds that the website link does not create a genuine dispute as to defendant's stated purpose.  Further, in plaintiff's declaration, he states that he "was never informed or instructed by anyone at Bonneville or at KHTK that I had to do anything in particular, or to refrain from doing anything in particular, in order to be 'aligned' with the company's so-called stated purpose to build up, connect, inform, and celebrate communities and families."  (Doc. No. 84 at ¶ 2.)  The court finds that evidence of plaintiff's unawareness of defendant's stated purpose or of a lack of guidance as to how to align with it also does not create a genuine dispute as to the fact of defendant's stated purpose.

[3]  The parties dispute the name of the radio show, with defendant claiming the show was called "The Grant Napear Show" and plaintiff claiming that the show was called "The Grant Napear Show with Doug Christie."  (DUF ¶ 5.)  The court does not find this discrepancy material and observes that, according to plaintiff's deposition, plaintiff began this show on KHTK on October 1, 1995, and the show's name varied over the years.  (Doc. No. 77-3 at 3–4.)  The court will refer to the radio show in question as "the Show" throughout this order.

On May 31, 2020, plaintiff received a tweet from former Sacramento Kings player Demarcus Cousins asking, "What's your take on BLM [Black Lives Matter]?". (DUF ¶ 16.) Plaintiff responded to Mr. Cousins' tweet from the handle @GrantNapearshow: "Hey!!!! How are you? Thought you forgot about me. Haven't heard from you in years. ALL LIVES MATTER . . . EVERY SINGLE ONE!!!" ("the Tweet"). (DUF ¶¶ 17, 19.) May 31, 2020 was less than a week after the killing of George Floyd, and in the midst of the resulting racial justice protests across the country, including those taking place in Sacramento. (DUF ¶ 18.) Plaintiff's Tweet elicited critical comments and reactions from people on Twitter, including former players for the Sacramento Kings. (DUF ¶ 20.) Some responses and/or retweets to the Tweet on Twitter expressed the view that plaintiff had embarrassed the Kings and needed to be fired and taken off the radio. (DUF ¶ 21.)

On June 1, 2020, before plaintiff was scheduled to go on the radio at 3:00 p.m., defendant placed him on administrative leave while it considered its next steps. (DUF ¶ 24.) Later that day, at 5:25 p.m., Darrell Brown, defendant's president at the time, emailed Steve Cottingim, defendant's senior vice president and market manager, and wrote: "Let's see what the Kings do before we move forward." (DUF ¶¶ 23, 26; PUF ¶ 1; Doc. No. 78 at ¶ 1.) On June 2, 2020, at 12:27 p.m., John Rinehart, the President of Business Operations for the Sacramento Kings, texted Cottingim indicating that the Kings were planning to release the following statement: "We have parted ways with play-by-play announcer Grant Napear." (DUF ¶¶ 23, 28.) Later that day, at 4:04 p.m., defendant sent plaintiff a termination notice. (DUF ¶ 34.)

**B.    Procedural Background**

On May 11, 2023, plaintiff filed his operative second amended complaint ("SAC"). (Doc. No. 49.) This action now proceeds only on the following two claims asserted in the SAC: (1) retaliation under California Labor Code §§ 1101 and 1102; and (2) wrongful termination in violation of public policy. (*Id.*)[4]

---

[4] In its order of July 25, 2023, the court granted defendant's motion to dismiss plaintiff's claim for discrimination on the basis of religion in violation of the California Fair Employment and Housing Act, California Government Code § 12940, *et seq.* for failure to state a claim, without further leave to amend. (Doc. No. 65 at 23.)

1   On May 29, 2024, defendant filed the pending motion for summary judgment as to both of

2   plaintiff's claims and concurrently filed a request to seal.  (Doc. Nos. 74, 79.)  After receiving an

3   extension of time in which to do so, on June 22, 2024, plaintiff filed his opposition to defendant's

4   motion.  (Doc. No. 86.)  On July 5, 2024, defendant filed a reply thereto.  On December 23, 2024,

5   the court denied defendant's request to seal without prejudice.  (Doc. No. 94.)  On January 16,

6   2025, defendant filed a renewed request to seal.  (Doc. No. 95.)

7   **LEGAL STANDARD**

8   Summary judgment is appropriate when the moving party "shows that there is no genuine

9   dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

10   Civ. P. 56(a).

11   In summary judgment practice, the moving party "initially bears the burden of proving the

12   absence of a genuine issue of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387

13   (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The moving party

14   may accomplish this by "citing to particular parts of materials in the record, including

15   depositions, documents, electronically stored information, affidavits or declarations, stipulations

16   (including those made for purposes of the motion only), admissions, interrogatory answers, or

17   other materials," or by showing that such materials "do not establish the absence or presence of a

18   genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

19   Fed. R. Civ. P. 56(c)(1)(A), (B).  When the non-moving party bears the burden of proof at trial,

20   "the moving party need only prove that there is an absence of evidence to support the non-moving

21   party's case."  *Oracle Corp.*, 627 F.3d at 387 (citing *Celotex*, 477 U.S. at 325); *see also* Fed. R.

22   Civ. P. 56(c)(1)(B).  Indeed, after adequate time for discovery and upon motion, summary

23   judgment should be entered against a party who fails to make a showing sufficient to establish the

24   existence of an element essential to that party's case, and on which that party will bear the burden

25   of proof at trial.  *See Celotex*, 477 U.S. at 322.  "[A] complete failure of proof concerning an

26   essential element of the nonmoving party's case necessarily renders all other facts immaterial."

27   *Id.* at 322–23.  In such a circumstance, summary judgment should be granted, "so long as

28   /////

1  whatever is before the district court demonstrates that the standard for the entry of summary

2  judgment . . . is satisfied." *Id.* at 323.

3      If the moving party meets its initial responsibility, the burden then shifts to the opposing

4  party to establish that a genuine issue as to any material fact actually does exist. *See Matsushita*

5  *Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the

6  existence of this factual dispute, the opposing party may not rely upon the allegations or denials

7  of its pleadings but is required to tender evidence of specific facts in the form of affidavits or

8  admissible discovery material in support of its contention that the dispute exists. *See* Fed. R. Civ.

9  P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11; *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773

10  (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for

11  summary judgment."). The opposing party must demonstrate that the fact in contention is

12  material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the

13  dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the

14  non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986).

15      In the endeavor to establish the existence of a factual dispute, the opposing party need not

16  establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual

17  dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

18  trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

19  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in

20  order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (citations

21  omitted).

22      "In evaluating the evidence to determine whether there is a genuine issue of fact," the

23  court draws "all inferences supported by the evidence in favor of the non-moving party." *Walls v.*

24  *Cent. Contra Costa Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011). It is the opposing party's

25  obligation to produce a factual predicate from which the inference may be drawn. *See Richards*

26  *v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th

27  Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than

28  simply show that there is some metaphysical doubt as to the material facts. . . . Where the record

5

1    taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no

2    'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 586–87 (citations omitted).

## ANALYSIS

3

4        As noted, defendant moves for summary judgment in its favor as to plaintiff's claims,

5    asserting that both depend on whether defendant's termination of plaintiff as the on-air host of

6    KHTK's daily radio show violated California Labor Code §§ 1101 and 1102.  (Doc. No. 75 at

7    13.)  Defendant argues that plaintiff's claims fail as a matter of law because California Labor

8    Code §§ 1101 and 1102 are unconstitutional as applied to defendant's termination of plaintiff and

9    would violate defendant's constitutional rights of free press, expressive association, and free

10    speech.  (*Id.*)  For the reasons explained below, the court agrees as to defendant's free speech

11    argument and will grant defendant's motion for summary judgment in their favor on that ground.[5]

12    The court will, however, first address a preliminary matter.

13    **A.    Request to Seal**

14        As noted above, on May 29, 2024, defendant filed a notice of its request to seal Exhibit 1

15    to the declaration of Steve Cottingim, consisting of the Employment Agreement, in support of its

16    motion for summary judgment.  (Doc. No. 79.)  On December 23, 2024, the court denied

17    defendant's request, finding that although defendant argued that the Employment Agreement

18    contained sensitive information regarding defendant's employment policies and its salary, bonus,

19    and benefits structure, defendant had failed to meet its burden of articulating compelling reasons

20    justifying the sealing of the exhibit in its entirety.  (Doc. No. 94 at 3–4.)  The court observed that

21    it "failed to see why seemingly innocuous portions of the Employment Agreement, such as the

22

---

23    [5]  In the alternative, defendant argues that it is entitled to summary judgment on these claims
      because plaintiff published the Tweet in his official capacity and §§ 1101 and 1102 do not apply

24    to actions taken by an employee in their official capacity.  (Doc. No. 75 at 24.)  Defendant also
      argues that even if §§ 1101 and 1102 apply to defendant's termination of plaintiff, the undisputed

25    evidence on summary judgment establishes that his termination was not politically motivated.
      (*Id.* at 25–26.)  In the court's view, these arguments appear to involve disputed issues of material

26    fact that are not properly resolved on summary judgment.  In addition, because the court finds
      defendant's free speech argument to be dispositive, it need not address defendant's other

27    arguments advanced in support of its motion for summary judgment—predicated on its free press
      and expressive association rights under the First Amendment—in resolving the pending motion.

28

term of employment or the signature page, should be sealed when it appears that redacting the

sensitive terms, such as salary, bonuses, and benefits, may suffice," and denied defendant's

request without prejudice to a more narrowly tailored renewal based upon an appropriate

showing.  (*Id*. at 4–5.)  On January 16, 2025, defendant filed a renewed request to seal the

Employment Agreement and attached a copy of the exhibit containing appropriate redactions.

(Doc. Nos. 95, 95-1.)  The same day, plaintiff filed a statement of non-opposition to defendant's

renewed request to seal.  (Doc. No. 96.)

All documents filed with the court are presumptively public.  *San Jose Mercury News,*

*Inc. v. U.S. Dist. Court*, 187 F.3d 1096, 1103 (9th Cir. 1999) ("It is well-established that the fruits

of pretrial discovery are, in the absence of a court order to the contrary, presumptively public.").

"Historically, courts have recognized a 'general right to inspect and copy public records and

documents, including judicial records and documents.'"  *Kamakana v. City & Cty. of Honolulu*,

447 F.3d 1172, 1178 (9th Cir. 2006) (quoting *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589,

597 & n.7 (1978)).[6]

Two standards generally govern requests to seal documents.  *Pintos v. Pac. Creditors*

*Ass'n*, 605 F.3d 665, 677 (9th Cir. 2010).

> [J]udicial records attached to dispositive motions [are treated]
> differently from records attached to non-dispositive motions.  Those
> who seek to maintain the secrecy of documents attached to
> dispositive motions must meet the high threshold of showing that
> "compelling reasons" support secrecy.  A "good cause" showing
> under Rule 26(c) will suffice to keep sealed records attached to non-
> dispositive motions.

*Kamakana*, 447 F.3d at 1180 (citing *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122,

1135–36 (9th Cir. 2003)).  The reason for these two different standards is that "[n]ondispositive

motions are often unrelated, or only tangentially related, to the underlying cause of action, and, as

a result, the public's interest in accessing dispositive materials does not apply with equal force to

non-dispositive materials."  *Pintos*, 605 F.3d at 678 (internal quotation marks omitted).

---

[6]  Pursuant to Federal Rule of Civil Procedure 5.2(d), a court "may order that a filing be made under seal without redaction."  However, even if a court permits such a filing, it may "later unseal the filing or order the person who made the filing to file a redacted version for the public record."

Under the "compelling reasons" standard applicable to dispositive motions, such as a motion for summary judgment:

> [T]he court must conscientiously balance the competing interests of the public and the party who seeks to keep certain judicial records secret. After considering these interests, if the court decides to seal certain judicial records, it must base its decision on a compelling reason and articulate the factual basis for its ruling, without relying on hypothesis or conjecture.

*Kamakana*, 447 F.3d at 1178–79 (internal quotation marks and citations omitted). The party seeking to seal a judicial record bears the burden of meeting the "compelling reasons" standard. *Id.* at 1178.

While the terms "dispositive" and "non-dispositive" motions are often used in this context, the Ninth Circuit has clarified that the "compelling reasons" standard applies whenever the motion at issue "is more than tangentially related to the merits of a case." *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1101 (9th Cir. 2016). The court agrees with defendant that the "compelling reasons" standard applies here. (*See* Doc. No. 95 at 2–3.)

"In general, 'compelling reasons' sufficient to . . . justify sealing court records exist when such 'court files might . . . become a vehicle for improper purposes,' such as the use of records to gratify private spite, promote public scandal, circulate libelous statements, or release trade secrets." *Kamakana*, 447 F.3d at 1179 (quoting *Nixon*, 435 U.S. at 598). "The mere fact that the production of records may lead to a litigant's embarrassment, incrimination, or exposure to further litigation will not, without more, compel the court to seal its records." *Kamakana*, 447 F.3d at 1179.

Here, defendant seeks permission to file its redacted copy of the Employment Agreement that withholds information regarding defendant's compensation of plaintiff and other employees, including information regarding salary, talent fees, bonuses, benefits, matching policies, severance policies, and licenses or rights of use. (Doc. No. 95 at 2–3.) Defendant argues that "[t]he release of such information could harm Bonneville's competitive position because, among other things, it would reveal Bonneville's business priorities and arm Bonneville's competitors with information to target Bonneville's employees and unfairly compete with Bonneville in the

marketplace."  (*Id*. at 3.)  Courts have found it appropriate to redact such private information of competitive value.  *See United States v. Univ. of S. California*, No. 2:18-cv-08311-WLH-AS, 2024 WL 4467586, at *1 (C.D. Cal. Aug. 12, 2024) (granting the defendant's application to seal "the redacted portions of the letters . . . including salaries, stipends, and tenure track status"); *Brown v. Brown*, No. 13-cv-03318-SI, 2013 WL 12400041, at *1 (N.D. Cal. Dec. 30, 2013) (granting the defendant's request to seal "confidential information" about "salary, stock options, bonuses, consulting fees, severance, and equity interests"); *see also Roadrunner Intermodal Servs., LLC v. T.G.S. Transp., Inc*., No. 1:17-cv-01056-DAD-BAM, 2018 WL 432654, at *4 (E.D. Cal. Jan. 16, 2018) (finding that "public release of [] salary information could harm [the defendant's] competitive standing" and accordingly granting the defendant's request to redact "information reflecting the salaries paid to its employees"); *Pryor v. City of Clearlake*, No. 11-cv-00954-CW, 2012 WL 3276992, at *5 (N.D. Cal. Aug. 9, 2012) (ordering documents pertaining to a defendant's appointment as a police officer to be filed with redactions regarding the officer's pay).  The court agrees that the information that defendant has redacted from the Employment Agreement may be used to harm litigants in this case and is persuaded that defendant has made a sufficient showing that there is a compelling interest to justify the filing of the exhibit in the proposed redacted form.

Accordingly, defendant's request to file a redacted version of the Employment Agreement on the public docket (Doc. Nos. 95, 95-1) will be granted, and the Clerk of the Court is directed to maintain the unredacted version of the exhibit, submitted via email, under seal.

**B.    Plaintiff's Retaliation Claim**

As noted, defendant argues that the court should grant summary judgment in its favor on plaintiff's retaliation claim brought under California Labor Code §§ 1101 and 1102 because these statutes, as applied to defendant's termination of plaintiff, would violate defendant's free speech

/////

/////

/////

/////

9

1  rights as protected by the First Amendment to the United States Constitution.[7]  (Doc. No. 75 at
2  20–24.)

3      In 1937, "the California Legislature, recognizing that employers could misuse their
4  economic power to interfere with the political activities of their employees, enacted Labor Code
5  sections 1101 and 1102 to protect the employees' rights."  *Gay L. Students Ass'n. v. Pac. Tel. &*
6  *Tel. Co.*, 24 Cal. 3d 458, 486–87 (1979) *superseded by statute as stated in In re Marriage Cases*,
7  43 Cal. 4th 757, 835 n.56 (2008).  California Labor Code § 1101 provides that "[n]o employer
8  shall make, adopt, or enforce any rule, regulation, or policy:  (a) Forbidding or preventing
9  employees from engaging or participating in politics . . . [or] (b) Controlling or directing, or
10  tending to control or direct the political activities or affiliations of employees."  Similarly, § 1102
11  provides that "[n]o employer shall coerce or influence or attempt to coerce or influence his
12  employees through or by means of threat of discharge or loss of employment to adopt or follow or
13  refrain from adopting or following any particular course or line of political action or political
14  activity."

15      Defendant argues that applying California Labor Code §§ 1101 and 1102 to its
16  termination of plaintiff would violate its free speech rights which must prevail over the
17  application of state laws providing protection to employees.  (Doc. No. 75 at 20.)  It argues that
18  an employment decision about who to cast as its radio host is inherently expressive and tied to the
19  company's creative process, and the decision to "not cast [plaintiff] following his divisive
20  comment was itself an expression about the tone, style, and, indeed, the voice of commentary the
21  station would deliver."  (*Id.* at 22.)  In advancing this argument, defendant acknowledges that the
22  First Amendment does not "allow it to terminate *any* employee without violating Sections 1101
23  and 1102" but argues that those provisions of state law "cannot constitutionally preclude a media
24  company from terminating a public-facing employee whose job was to speak for the entity when

---

[7]  Defendant clearly brings an "as-applied" challenge and not a "facial" challenge to California
Labor Code §§ 1101 and 1102.  "A facial challenge seeks to strike down a law in its
entirety . . . ."  *Project Veritas v. Schmidt*, 125 F.4th 929, 940 (9th Cir. 2025) (en banc).  "An as-
applied challenge contends that the law is unconstitutional as applied to the litigant's particular
speech activity, even though the law may be capable of valid application to others."  *Id.* at 939
(quoting *Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998)).

that employee acts in a way that undermines the entity's credibility and editorial voice." (*Id*. at 23.) Plaintiff counters that his termination was not a casting decision because "[t]here was no evidence of Plaintiff's show changing creative direction or canceled (sic), so . . . there was no creative-based reason to fire [him]." (Doc. No. 86 at 11–12.)[8]  In reply, defendant argues that a "decision about who would (or would not) host its radio show [] is fundamentally a casting decision for its programming," and following plaintiff's Tweet, defendant "did not wish to express its message and creative content through [plaintiff]" and "was not required to do so." (Doc. No. 89 at 14–15.)

To determine whether applying §§ 1101 and 1102 to plaintiff's termination would violate defendant's free speech rights, the court will first examine whether defendant's "casting decision" regarding plaintiff's position as the Show's host is an act of speech entitled to First Amendment protection. If so, the court must then examine whether §§ 1101 and 1102 regulate that speech, and, if they do, determine whether such regulation passes constitutional muster.

    1.    <u>Whether Plaintiff's Termination Constitutes Protected Speech</u>

The First Amendment ensures that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. The Fourteenth Amendment has extended this principle to the states. *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 547 (1975); *Arizona Attorneys for Criminal Justice v. Mayes*, 127 F.4th 105, 109 (9th Cir. 2025). First Amendment jurisprudence has long understood "speech" to extend "beyond written or spoken words as mediums of expression," *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569 (1995), reaching so far as to include "various forms of entertainment and visual expression as purely expressive activities." *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1060 (9th Cir. 2010); *see also Project Veritas v. Schmidt*, 125 F.4th 929, 943 (9th Cir. 2025) (en banc). Conduct constitutes protected speech if it is "sufficiently imbued with elements of

---

[8]  Plaintiff also appears to argue that because the "tweet was made on his personal Twitter account" it "remains within the realm of personal expression and is protected by the First Amendment." (Doc. No. 86 at 12–13.)  However, plaintiff is not pursuing a claim for a violation of *his* First Amendment rights in this action.  Accordingly, the court will disregard this argument advanced by plaintiff as irrelevant to resolving defendant's pending motion.

communication to fall within [the First Amendment's] scope." *Spence v. Washington*, 418 U.S.

405, 409–10 (1974).  As the Ninth Circuit has observed,

> The process of expression through a medium has never been thought so distinct from the expression itself that we could disaggregate Picasso from his brushes and canvas, or that we could value Beethoven without the benefit of strings and woodwinds.  In other words, we have never seriously questioned that the processes of writing words down on paper, painting a picture, and playing an instrument are purely expressive activities entitled to full First Amendment protection.

*Anderson*, 621 F.3d at 1062; *see also Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65–66,

(1981) ("[P]rograms broadcast by radio and television . . . fall within the First Amendment

guarantee[.]"); *Project Veritas*, 125 F.4th at 942 ("It is well established that audio recordings and

audiovisual recordings are generally entitled to First Amendment protection.")  Such creative

protected processes include choices as to who participates in the production of speech.

*McDermott v. Ampersand Pub., LLC*, 593 F.3d 950, 962 (9th Cir. 2010) ("To the extent the

publisher's choice of writers affects the expressive content of its newspaper, the First Amendment

protects that choice.") (citing *Hurley*, 515 U.S. at 572–73).

However, despite these guiding principles, "there is surprisingly little case law addressing

the extent to which casting of creative performances qualifies as speech protected by the First

Amendment."  *Moore v. Hadestown Broadway Limited Liability Company*, 722 F.Supp.3d 229,

261 (S.D.N.Y. 2024); *see also Claybrooks v. Am. Broad. Companies, Inc.*, 898 F. Supp. 2d 986,

996 (M.D. Tenn. 2012) ("With respect to casting decisions for an entertainment program of any

kind, it appears that no federal court has addressed the relationship between anti-discrimination

laws and the First Amendment.  . . .  Accordingly, the court must analyze this issue of first

impression in light of relevant First Amendment principles.").

The few courts to have been called upon to address First Amendment protections for

casting decisions made in the producing of a creative work have universally found that where

"regulating the casting process necessarily regulates the end product . . . casting and the resulting

work of entertainment are inseparable and must *both* be protected to ensure that the producers'

freedom of speech is not abridged."  *Claybrooks*, 898 F. Supp. 2d at 999; *see also Green v. Miss*

1  *United States of Am., LLC*, 52 F.4th 773, 780 (9th Cir. 2022) (affirming the district court's grant

2  of summary judgment in favor of the defendant pageant and concluding that Oregon's Public

3  Accommodations Act, as applied to require the pageant to accept a transgender woman as a

4  contestant, violated the pageant's free speech rights, noting that "it is clear that *who* competes and

5  succeeds in a pageant is *how* the pageant speaks" and "the Pageant's message cannot be divorced

6  from the Pageant's selection and evaluation of contestants"); *Moore*, 722 F. Supp. 3d at 262

7  (holding that a Black theater actress, who was fired and replaced with a white actress to avoid

8  expressing a "white savior story" that was unintended by the producers, could not maintain a race

9  discrimination claim against the defendant Broadway production because the "First Amendment

10 protects Hadestown's creative decision to express its preferred message"); *Symmonds v.*

11 *Mahoney*, 31 Cal. App. 5th 1096, 1106 (2019) (finding that the defendant singer had met his

12 burden of demonstrating that firing his drummer was protected conduct implicating the

13 defendant's free speech rights, noting that the "selection of a drummer is analogous to a casting

14 decision regarding who is to perform music"); *Hunter v. CBS Broad. Inc.,* 221 Cal. App. 4th

15 1510, 1521 (2013) (holding that the selection of weather anchors, "which were essentially casting

16 decisions," was "conduct [that] qualifies as a form of protected activity").

17      The court therefore concludes that the process of creating an expressive work (such as the

18 Show involved in this case), which may involve decisions as to who participates in its

19 presentation, is entitled to First Amendment protection when it cannot be separated from the

20 expressive product.  *See Anderson*, 621 F.3d at 1062 (noting that the Supreme Court in *Hurley*

21 held that "the process involved in producing a parade," including decisions as to which floats may

22 participate, "cannot be meaningfully separated from the parade's expressive product in terms of

23 the constitutional protection afforded"); *see also Project Veritas*, 125 F.4th at 943; *American*

24 *Civil Liberties Union of Illinois v. Alvarez*, 679 F.3d 583, 595–96 (7th Cir. 2012) ("By way of a

25 simple analogy, banning photography or note-taking at a public event would raise serious First

26 Amendment concerns; a law of that sort would obviously affect the right to publish the resulting

27 photograph or disseminate a report derived from the notes.  The same is true of a ban on audio

28 and audiovisual recording.").

1      Here, plaintiff was the host and on-air talent of the Show, which aired daily.  (DUF ¶ 5;

2  Doc. No. 95-1 at 2.)  For each production, he necessarily contributed to the Show's speech and

3  message while serving in this role, certainly more so than a member of a large cast.  *See, e.g.*,

4  *Moore*, 722 F. Supp. 3d at 241 (finding that the First Amendment protected the defendant

5  company's decision to fire the plaintiff, who played the role of "worker #1" in the musical's

6  "workers chorus"); *Claybrooks*, 898 F. Supp. 2d at 989 (finding that the First Amendment

7  protected the defendant's decision not to cast either of the plaintiffs in a lead role on its reality

8  television dating show with approximately 25 other cast members).[9]  As the Show's host,

9  plaintiff's casting is inseparable from the resulting work of entertainment of the Show.  This is so

10  because plaintiff's speech, including his demeanor and tone, necessarily comprised the Show's

11  speech.  Therefore, under the applicable legal authorities, a decision to cast or not cast plaintiff

12  and "the resulting work of entertainment are inseparable and must *both* be protected."

13  *Claybrooks*, 898 F. Supp. 2d at 999 (holding that the plaintiffs could not maintain a

14  discrimination action against the defendant television producer because "the Shows' casting

15  decisions are part and parcel of the Shows' creative content"); *see also Green*, 52 F.4th at 781

16  /////

---

[9] Thus, the First Amendment places some limitations on political speech protection laws and this is especially the case where, as here, an employee speaks on the employer's behalf to the public. As one legal commentator addressing this area has observed:

> Employers that speak must necessarily speak through their employees; and when an employee or prospective employee says things—even off the job—that would undermine the employer's message, the employer must be able to stop using the employee as a speaker.

> *This is particularly true for employees such as broadcasting* and print reporters, opinion columnists, actors, and the like.  It should also be true for employers' commercial spokespeople, who are supposed to be the public face of the employer.  Though commercial speech is less protected than other speech, it is still protected to a considerable extent; and the ability to convey a commercial message through a spokesperson may be sharply undermined by public consciousness of the spokesperson's outside speech.

Eugene Volokh, *Should the Law Limit Private-Employer-Imposed Speech Restrictions?*, 2 Journal of Free Speech Law 269, 283 (2022) (emphasis added).

1  (finding that for certain expressive productions, "there is no daylight between speech and

2  speaker").

3          In his opposition to the pending motion, plaintiff does not attempt to argue that his role or

4  his casting as the host of defendant's Show did not affect how the Show spoke or conveyed its

5  message.  Instead, plaintiff only argues that he was not subject to a casting decision termination

6  because "[t]here was no evidence of Plaintiff's show changing creative direction or canceled

7  (sic), so . . . there was no creative-based reason to fire [him]."  (Doc. No. 86 at 11–12.)  Plaintiff

8  seems to suggest that in order for a casting decision to warrant constitutional protection under the

9  First Amendment, there must be a change of creative direction within the work, or perhaps a

10  threat of its cancellation without a change.  Plaintiff points to no authority establishing such a

11  requirement.  In any event, the court is skeptical of plaintiff's argument in light of the decisions

12  addressing the First Amendment protections to be afforded to those producing expressive product.

13  *See Hurley*, 515 U.S. at 573 ("A speaker has the autonomy to choose the content of his own

14  message."); *see also Boy Scouts of America v. Dale*, 530 U.S. 640, 653 (2000) ("As we give

15  deference to an association's assertions regarding the nature of its expression, we must also give

16  deference to an association's view of what would impair its expression."); *McDermott*, 593 F.3d

17  at 962 ("Telling the newspaper that it must hire specified persons, namely the discharged

18  employees, as editors and reporters constituting over 20 percent of its newsroom staff is bound to

19  affect what gets published."); *Moore*, 722 F.Supp.3d at 262 ("The First Amendment protects

20  Hadestown's creative decision to express its preferred message regardless of whether it made the

21  decision in its initial casting calls or after the unintended message was brought to its attention

22  after several performances of the Musical, as was the case here.").

23          However, even if a creative change were a requirement for First Amendment protections

24  to attach to a termination decision, the court observes that defendant has indeed identified on

25  summary judgment a "creative-based reason" for firing plaintiff.  As noted, the centerpiece of the

26  KHTK station is the Kings play-by-play and broadcast content related to the team.  (DUF ¶ 3.)  It

27  is undisputed that plaintiff's Tweet elicited critical comments and reactions from individuals on

28  Twitter, including from other former Kings players, and some of those responses reflected the

1  view that plaintiff had embarrassed the Kings and needed to be fired and taken off the air.  (DUF

2  ¶¶ 20, 21.)  It is also undisputed that the Kings organization parted ways with plaintiff as their

3  play-by-play announcer, *before* defendant took any action to terminate plaintiff's employment.

4  (DUF ¶¶ 28, 29.)  In light of these circumstances, defendant determined that plaintiff's actions

5  were likely to undermine its credibility with the community and its editorial voice, and it no

6  longer wanted to express its message through plaintiff.  (DUF ¶ 2; Doc. No. 78-9 at 3.)[10]  This

7  determination was a "creative-based decision," and it presents parallels to those made in *Moore*,

8  where a Broadway director decided that continuing to cast the plaintiff in the role in question

9  would cause the creative work to send an unintended, unsavory message.  *Moore*, 722 F. Supp. 3d

10  at 256–63 (holding that the defendant was constitutionally protected in firing the plaintiff actress

11  in order to adjust the message of the performance).  Here, defendant enjoys similar First

12  Amendment protections in its decision that continuing to cast plaintiff as its radio host of the

13  Show would involve creating and presenting speech that it did not wish to deliver to its audience

14  and would affect defendant's ability to convey its preferred messaging.[11]

15

---

16  [10]  Again, in his declaration, plaintiff states that he "was never informed or instructed by anyone
at Bonneville or at KHTK that I had to do anything in particular, or to refrain from doing
17  anything in particular, in order to be 'aligned' with the company's so-called stated purpose to
18  build up, connect, inform, and celebrate communities and families."  (Doc. No. 84 at ¶ 2.)
Plaintiff has provided no authority in support of his apparent position that his own knowledge of
19  defendant's aims or intended message is required for First Amendment protections to attach to
defendant's casting decisions.  Moreover, other district court decisions have implicitly found that
20  this is not the case.  *See Claybrooks*, 898 F. Supp. 2d at 1000 ("Ultimately, whatever messages
*The Bachelor* and *The Bachelorette* communicate or are intended to communicate—whether
21  explicitly, implicitly, intentionally, or otherwise—the First Amendment protects the right of the
producers of these Shows to craft and control those messages, *based on whatever considerations*
22  *the producers wish to take into account*.") (emphasis added); *Moore*, 722 F. Supp. 3d at 256–63
(where the production's decision to fire actors in order to adjust the show's messaging took place
23  mid-production and was nonetheless found to be entitled to First Amendment protection).

24

25  [11]  The court notes that plaintiff has not argued that defendant's stated purpose of "building up,
connecting, informing, and celebrating communities and families" is too vague of a message to
26  warrant constitutional protection, and for good reason.  The Supreme Court has held that "a
narrow, succinctly articulable message is not a condition of constitutional protection, which if
27  confined to expressions conveying a 'particularized message' . . . would never reach the
unquestionably shielded painting of Jackson Pollock, music of Arnold Schoenberg, or
28  Jabberwocky verse of Lewis Carroll."  *Hurley*, 515 U.S. at 569–70.

1    Accordingly, the court concludes that as a matter of law defendant's termination of

2    plaintiff as the host of its Show was a "casting decision" that constitutes speech with

3    accompanying First Amendment protections.  The court will next turn to California Labor Code

4    §§ 1101 and 1102 to determine whether enforcement of those provisions in this case would

5    compel defendant to retain plaintiff and therefore alter defendant's speech.

6            2.        Enforcement of California Labor Code §§ 1101 and 1102

7    As noted above, California Labor Code § 1101 provides that "[n]o employer shall make,

8    adopt, or enforce any rule, regulation, or policy:  (a) Forbidding or preventing employees from

9    engaging or participating in politics or from becoming candidates for public office [or]

10   (b) Controlling or directing, or tending to control or direct the political activities or affiliations of

11   employees."  As the court explained in its previous order resolving defendant's motion to dismiss,

12   under some circumstances the termination of an employee may be considered a declaration by the

13   employer of a particular policy regarding the expressed political viewpoint or activity of the

14   employee.  (Doc. No. 48 at 17 n.5.)  For example, in this case plaintiff's termination might be

15   considered by a trier of fact to be a declaration by defendant of a particular policy in favor of the

16   Black Lives Matter movement, thereby tending to control or direct the political activities or

17   affiliations of its employee, plaintiff, as prohibited by § 1101.  (*Id.*)  California Labor Code

18   § 1102 does not similarly require that the employer make a "policy," but it instead provides that

19   "[n]o employer shall coerce or influence or attempt to coerce or influence his employees through

20   or by means of threat of discharge or loss of employment to adopt or follow or refrain from

21   adopting or following any particular course or line of political action or political activity."  This

22   provision "prohibits an employer from attempting to control its employees' political activity

23   through threat of discharge or loss of employment for political reasons" and serves "to protect

24   employees' political freedom."  *Couch v. Morgan Stanley & Co*., No. 1:14-cv-00010-LJO-JLT,

25   2015 WL 4716297, at *11, 16 (E.D. Cal. Aug. 7, 2015), *aff'd*, 656 F. App'x 841 (9th Cir. 2016).

26   While there is "limited case law interpreting" these sections of the California Labor Code or

27   guiding their application, the court finds that if §§ 1101 and 1102 apply to plaintiff's termination

28   as plaintiff suggests, those provisions could be found to prevent plaintiff's termination were it

17

found to be based on a political motive. *Id*. at *16; *see also Couch v. Morgan Stanley & Co.,* 656 F. App'x 841, 843 (2016) ("Two California Court of Appeal decisions have held that liability under §§ 1101(a) and 1102 is triggered only if an employer fires an employee based upon a political motive."); *Ross v. Indep. Living Res. of Contra Costa Cnty.*, No. 08-cv-00854-TEH, 2010 WL 1266497, at *1–2, *6 (N.D. Cal. Apr. 1, 2010) (finding that the plaintiff sufficiently stated a claim under § 1101 by alleging that his employer terminated him days after learning that he had brought a disability access lawsuit against a recreational facility and the lawsuit was publicized); *Snyder v. Alight Solutions*, No. 21-00187-CJC-KES, 2022 WL 17184979, at *3 (C.D. Cal. Sept. 14, 2022) (denying summary judgment, finding there was a genuine dispute of material fact regarding whether the plaintiff was fired based on a political motive); *Surdak v. DXC Tech.*, No. 5:22-cv-00921-SB-KK, 2022 WL 18142545, at *7 (C.D. Cal. Dec. 20, 2022) (denying summary judgment as to the plaintiff's claim that he was terminated in violation of §§ 1101 and 1102 where the defendant conceded that it fired the plaintiff researcher, at least in part, because of his tweet and the plaintiff had "offered evidence that his tweet was politically motivated speech").

As discussed above, under the facts of this case, requiring defendant to retain plaintiff would alter defendant's speech and the message communicated through the Show, due in large part to plaintiff's significant and public role as the Show's host. Such compulsion is a "content-based regulation" and "warrants strict scrutiny." *Green*, 52 F.4th at 791; *see also Riley v. Nat'l Fed'n of the Blind. of N. Carolina, Inc.*, 487 U.S. 781, 795 (1988) ("[M]andating speech that a speaker would not otherwise make necessarily alters the content of the speech."); *X Corp v. Bonta*, 116 F.4th. 888, 900 (9th Cir. 2024).[12]

---

[12] Content-based regulations, as opposed to content-neutral regulations, target "speech on its communicative content." *Martinez v. City of Fresno*, No. 1:22-cv-00307-DAD-SAB, 2022 WL 1645549, at *7 (E.D. Cal. May 24, 2022). To determine whether a law is content based, courts consider "whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." *Recycle for Change v. City of Oakland*, 856 F.3d 666, 670 (9th Cir. 2017) (citing *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)); *see also Project Veritas*, 125 F.4th at 946–52 (addressing the determination of whether a law is content based or content neutral). A content-neutral regulation, such as a school anti-truancy policy, *Corales v. Bennett*, 567 F.3d 554, 566 (9th Cir. 2009), or a municipal noise regulation, *Ward v. Rock Against Racism*, 491 U.S. 781, 803 (1989), warrants an intermediate level of scrutiny.

1          3.      Application of Strict Scrutiny

2          "Content-based regulations 'are presumptively unconstitutional and may be justified only

3   if the government proves that they are narrowly tailored to serve compelling state interests.'"

4   *Green*, 52 F.4th at 791 (quoting *Reed*, 576 U.S. at 163); *see also Project Veritas*, 125 F.4th at

5   946–47 (citing 512 U.S. 622, 641 (1994)).  "Given the heightened concerns over chilling free

6   speech, the Supreme Court has demanded that 'precision . . . be the touchstone' of any law

7   regulating speech."  *Green*, 52 F.4th at 791 (quoting *NAACP v. Button*, 371 U.S. 415, 438 (1963))

8   (cleaned up).  "Additionally, there must be 'even more immediate and urgent grounds' to uphold

9   a law that forces 'involuntary affirmation of objected-to beliefs.'"  *Id.* (quoting *W. Va. State Bd.*

10  *of Educ. v. Barnette*, 319 U.S. 624, 633 (1943)).  In considering compelling interests to justify

11  this state regulation, the court is not to rely on "broadly formulated interests" and instead "must

12  scrutinize the asserted harm of granting specific exemptions."  *Fulton v. City of Philadelphia*, 593

13  U.S. 522, 541 (2021) (rejecting the defendant city's offer of its broad interests to uphold its

14  nondiscrimination policies such as "maximizing the number of foster parents, protecting the City

15  from liability, and ensuring equal treatment of prospective foster parents and foster children,"

16  noting that the question "is not whether the City has a compelling interest in enforcing its non-

17  discrimination policies generally, but whether it has such an interest in denying an exception to

18  [the petitioner].").

19          Here, defendant argues that "no compelling interest is present" in this case because

20  plaintiff's "alleged right to be free from political influence was impaired only to the limited extent

21  that he could not continue to work at KHTK and associate the station with his choice of content."

22  (Doc. No. 75 at 20.)  Plaintiff does not respond to defendant's argument in this regard, nor does

23  he point to any interest that would justify the application of California Labor Code §§ 1101 and

24  1102 to his termination.

25          The court agrees with defendant's framing, since any compelling interest to justify the

26  restriction on defendant's speech must focus on §§ 1101 and 1102 as applied to the parties and

27  may not hinge on the state's purpose(s) for enacting these provisions generally.  *See Green*, 52

28  F.4th at 792 (concluding that broad formulations such as "eliminating discrimination" do not

1    suffice where evidence is lacking that the individual's expression of views would be eliminated

2    absent application of the challenged law).  As to the parties before the court in this case, if

3    California Labor Code §§ 1101 and 1102 are not applied to plaintiff's termination, plaintiff is not

4    prevented from participating in political activity and will still enjoy the protections of those

5    provisions in other employment contexts within the state, such as those where his work is

6    separable from his employer's speech.  Further, to the extent that §§ 1101 and 1102 operate to

7    protect other employees of defendant from political influence as a result of plaintiff's termination,

8    there has been no evidence or argument presented to the court on summary judgment that any

9    such influence on other, non-program host employees occurred or is likely to occur, let alone that

10    any impact is compelling enough to justify the restraint on defendant's speech that would take

11    place were an exception not recognized here.

12        Accordingly, the court finds no compelling interest supports the denial of a narrow

13    exception to the application of California Labor Code §§ 1101 and 1102 to defendant's

14    termination of plaintiff.  The court therefore holds that, only as applied to plaintiff under the

15    specific context presented in this case as supported by the evidence on summary judgment, these

16    statutes do not pass constitutional muster.  *Cf. Hurley*, 515 U.S. at 577 (noting that the Supreme

17    Court has found a compelling interest to exist where some speech or "speakers will be destroyed

18    in the absence of the challenged law").  Accordingly, defendant is entitled to summary judgment

19    in its favor on plaintiff's retaliation claim brought under California Labor Code §§ 1101 and

20    1102.

21        **C.    Plaintiff's Wrongful Termination in Violation of Public Policy Claim**

22        Defendant also moves for summary judgment in its favor as to plaintiff's claim for

23    wrongful termination in violation of public policy, arguing that it is a "derivative claim" that

24    depends on "whether Bonneville's termination of Mr. Napear violated Sections 1101 and 1102."

25    (Doc. No. 75 at 13.)  Plaintiff also does not respond to this argument in his opposition to the

26    pending motion.  (Doc. No. 86.)

27        In its prior order resolving defendant's motion to dismiss plaintiff's first amended

28    complaint, the court dismissed this claim ruling, in part, that plaintiff could only "proceed [upon

20

it] to the extent it relies on [plaintiff's] California Labor Code §§ 1101 and 1102 claim." (Doc. No. 65 at 23.) Accordingly, because the court will grant summary judgment in defendant's favor as to plaintiff's claim of retaliation brought under California Labor Code §§ 1101 and 1102 for the reasons explained above, it will also grant summary judgment in defendant's favor as to plaintiff's derivative wrongful termination in violation of public policy claim.

## CONCLUSION

Accordingly,

1.    Defendant's renewed request to seal (Doc. No. 95) is GRANTED;

2.    Defendant's motion for summary judgment (Doc. No. 74) is GRANTED;

3.    Judgment shall be entered in favor of defendant; and

4.    The Clerk of the Court is directed to close this case.

IT IS SO ORDERED.

Dated:    **March 31, 2025**

DALE A. DROZD
UNITED STATES DISTRICT JUDGE